UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------ --------------------------------------------------

MARTHA GARCIA,

        Plaintiff,

v.

GREAT ATLANTIC PARTNERS, LLC,
and
NISSAN MOTOR ACCEPTANCE CORPORATION,

        Defendants.

------ --------------------------------------------------

**COMPLAINT**

**AND JURY DEMAND**

**13 CV 4631**

## INTRODUCTION

1.     This is an action brought by an individual consumer under the Truth In Lending Act, 15 U.S.C. §§ 1601 et seq. ("TILA"), Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 et seq., New York General Business Law § 350, and for common law Fraud, Breach of Contract and Rescission/Mistake, seeking money damages, injunctive relief, and declaratory judgment.

2.     Specifically, Plaintiff Martha Garcia brings suit based on the illegal, unfair, abusive and deceptive practices employed by Defendants regarding an automobile purchase made on or about July , 2012, including but not limited to altering the consumer's contract and forging her signature on it; failing to provide her with numerous required disclosures; charging her more than the advertised price for the vehicle; adding a warranty to the vehicle without the consumer's knowledge or permission, at additional cost, and insisting that the purchase of a warranty was necessary in obtaining financing.

1

## JURISDICTION AND VENUE

3. Jurisdiction is based on 15 U.S.C. § 1640 and 28 U.S.C. § 1337.

4. The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201 and § 2202.

5. This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6. Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the property that is the subject of the action is situated in this District.

## THE PARTIES

7. Plaintiff Martha Garcia ("Plaintiff") is a resident of Westchester County, New York.

8. Defendant Great Atlantic Partners, LLC, d/b/a Advantage Nissan ("Advantage") is a domestic limited liability company operating under the laws of New York, whose principal place of business is located at 939 Old Country Road, Westbury, NY 11590.

9. Defendant Nissan Motor Acceptance Corporation ("NMAC") is a corporation incorporated under the laws of California which is authorized to do business in New York.

10. NMAC is the assignee of a Retail Installment Contract between Plaintiff and Advantage, and therefore, is liable for claims asserted against the Dealership under State and Federal law.

## FACTS

### Purchase of a Prior Automobile from Advantage

11. In the autumn of 2011, Plaintiff's sister Marina Rodriguez ("Rodriguez") received a mailing from Advantage, telling Rodriguez that she could purchase a car from Advantage, even though she had recently undergone a discharge of her debts through bankruptcy.

2

12. Despite the fact that Rodriguez is and at all relevant times was a resident of Westchester County, New York, and Advantage is located in Westbury, Long Island, Rodriguez and Plaintiff traveled to Advantage to purchase a car for Rodriguez's use, based on the representations made in the ad.

13. In or about November of 2011, Rodriguez believed that she had purchased a new (model year 2011) Nissan Rogue (the "2011 Nissan") from Advantage. Plaintiff believed that she had co-signed the loan for her sister. Neither Rodriguez nor Plaintiff received any documents whatsoever regarding the purchase of the 2011 Nissan Rogue, although they requested them from Advantage.

14. The payments for the 2011 Nissan were $361.97 per month.

15. A salesman employed by Advantage, told Rodriguez that she should return to Advantage in eight months and Rodriguez would be able to obtain a "better deal."

16. Rodriguez faithfully made the payments for the 2011 Nissan for eight months.

## Representations about the Purchase of the Vehicle

17. On or about July 2, 2012, Rodriguez indeed did return to Advantage, to obtain the "better deal."

18. On that date, Rodriguez discussed trading in her 2011 Nissan and purchasing a new 2012 Nissan Rogue ("the Vehicle") from Advantage, through Advantage Salesman Malvin Garcia, who reassured her that she would be getting a "much better deal."

19. The Vehicle had a prominent sticker price on the car which read $25,625.

20. Malvin Garcia told Rodriguez that she would be charged the sticker price.

3

21. Further Malvin Garcia told Rodriguez that, by trading in the 2011 Nissan, she would pay a total of only $1,500 more for the Vehicle over the length of the loan than she would have paid if she kept the 2011 Nissan.

22. Malvin Garcia turned Rodriguez over to a man named Jason, another employee of Advantage, to discuss financing the Vehicle.

23. Jason told Rodriguez that her monthly payments would be $499/month for the first four months and would then (after those first four months) drop to $300/month for the remainder of the loan.

24. Rodriguez told Jason that she could not afford to make $499/month payments, and he once again reassured her that the payment amount would drop after four months. Jason pointed out that her prior car payments for the 2011 Nissan were $361.97 per month, so that her payments would be lower than previously, after just the initial four months.

25. Rodriguez was upset, because she had believed that she would no longer need a co-signer after eight months of good payment history. However, Advantage told Rodriguez that she still required a co-signer because of her poor credit.

26. Because neither Plaintiff nor any other co-signer was with Rodriguez that day, Advantage told Rodriguez that they were unable to complete the sale of the car that day, but Jason told Rodriguez that he would send someone to her house to finalize the transaction.

27. When she left the dealership that day, Rodriguez was given no paperwork to review.

28. Rodriguez does not have strong English language skills, and all discussions at the dealership were in Spanish.

## Purchasing the Vehicle

29. On or about July 6, 2012, Advantage sent someone to visit Plaintiff and Rodriguez.

4

30. Advantage's representative presented Plaintiff with many English-language documents which Plaintiff signed, believing that she was co-signing for her sister's car.

31. Plaintiff asked for copies of all the documents she had signed, but Advantage refused to give them to her.

## Lowering the Monthly Payments

32. Plaintiff, on behalf of her sister, dutifully paid the required $499/month for four months, at which time they returned together to Advantage in or about late November of 2012 to see about lowering the monthly payments to $300/month, as Advantage had promised.

33. Advantage told Plaintiff and Rodriguez that Jason had recently been fired.

34. Advantage told Plaintiff and Rodriguez that they had been taken advantage of by Jason but there was nothing Advantage could do about the problem, because of Plaintiff's poor credit history.

35. Plaintiff and Rodriguez asked for copies of the documents related to the purchase of the Vehicle.

36. Advantage told them that Advantage had not retained any documents related to the purchase of the Vehicle.

## Obtaining the Loan Documents

37. Plaintiff and Rodriguez learned that they could obtain the documents related to the purchase of the vehicle by contacting NMAC.

38. In or about December of 2012, Plaintiff and Rodriguez obtained what purported to be the documents signed on or about July 6, 2012 from NMAC.

39. Upon examining these documents, Plaintiff discovered that her name had been written on the documents on the signature lines but the signatures on the documents were not her signature and did not resemble her signature. These documents appear to have been forged.

40. Even though the structure of the deal was supposed to be the purchase of the Vehicle by Rodriguez with Plaintiff as the co-signer, Plaintiff and Rodriguez learned that the Vehicle was in Plaintiff's name alone.

41. Not only was the Vehicle in Plaintiff's name; the 2011 Nissan had been in Plaintiff's name alone as well, even though Rodriguez had been assured that the purchase of the 2011 Nissan would help her credit and even though all payments on the 2011 Nissan had been made from Rodriguez's bank account.

42. Upon examining these documents, Plaintiff also discovered that she had allegedly purchased a warranty for $3,480 and a maintenance contract for $1520 although she did not request a warranty or a maintenance contract, was not told anything about a warranty or a maintenance contract, and was never (to date) given any documentation about the warranty or a maintenance contract.

43. Advantage did not discuss the warranty or a maintenance contract with Plaintiff at all and did not tell Plaintiff that her car was already covered by a manufacturer's warranty.

44. Upon examining these documents, Plaintiff also discovered that she was obligated by the terms of the "contract" to continue making payments at $499.97/month for the entire length of the loan, another 71 months.

45. The Retail Installment Contract (RIC) that showed a cash sale price of $31,223.12, although the sticker price on the car was $25,625.

46.  The Truth in Lending Act mandatory disclosure boxes at the top of the RIC were filled in to show that Plaintiff would be paying a 4.99 % annual percentage rate; that the amount financed was $32,090.29, that the dollar amount of the finance charge was $5407.46; that the total of all payments was $37,497.75; and that the total cost of the Vehicle's purchase (including a down payment of $2500.57 was $39,988.32.

47.  Nowhere did the RIC disclose that the Plaintiff was forced to purchase the extended warranty and maintenance contracts, nor are the costs of those items included in the finance charge.

### Subsequent Visits to the Dealership

48.  Plaintiff and Rodriguez visited the dealership on various occasions after seeing the paperwork. On each visit, they asked Advantage to take back the car and cancel the loan, or in the alternative, to honor the bargain Advantage had made with them. Advantage repeatedly refused.

49.  Plaintiff asked about the warranty and service contract and was told that they were necessary to include because Plaintiff could not have obtained financing without their inclusion, given her credit history.

50.  Even after Plaintiff confronted the dealership with the paperwork showing that she was being charged for warranties, the dealership refused to provide her with any paperwork regarding the warranties.

51.  At all relevant times Defendants acted willfully and in bad faith.

52.  The unlawful actions described herein harmed Plaintiff.

## COUNT I
## TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA")

53.  Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

7

54. Plaintiff's transaction as described herein was a consumer credit transaction within the meaning of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

55. Defendants are creditors within the meaning of TILA and Regulation Z.

56. The increase in the cash price of the vehicle from the price of $25,625 is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

57. The cash price increase is attributable to the warranty that Plaintiff was required to purchase from the Dealership incident to the extension of credit to Plaintiff, and is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

58. As a result of Defendants' failure to properly include these and/or other fees and charges as finance charges, the sale price, finance charge, amount financed, and APR disclosed in Plaintiff's RIC are all materially misstated, in violation of TILA and Regulation Z. e.g. § 1638(a)(2) through (5) and §226.18(b), (d), (e), and (h).

59. In failing to provide Plaintiff with any documents whatsoever, Defendants failed to provide Plaintiff with clear and conspicuous disclosures of the terms of the loan as required under TILA and Regulation Z. e.g. 15 U.S.C. § 1632(a), § 1638(a), and Regulation Z, e.g. 12 C.F.R § 226.17(a)(1).

60. As a result of Defendants' incomplete, inaccurate, and materially misstated disclosures, Plaintiff has suffered actual damages, including but not limited to the warranty that Plaintiff did not want or need but which was rolled into her purchase as a condition of receiving financing.

61. Had Defendants provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would not have agreed to purchase the vehicle on the terms and conditions imposed on her by the Defendants.

8

62. Additionally, had Defendants provided complete and accurate disclosure of all terms, costs finance charges and interest rates, Plaintiff would have sought and obtained alternate, lower cost financing.

63. For all these reasons, Defendants are liable under TILA and Regulation Z (see, e.g. 15 U.S.C. §§ 1640 and 1641) for statutory damages, actual damages, attorney's fees, litigation expenses and costs, for a declaratory judgment that they have violated TILA and Regulation Z, and for such other or further relief as the Court deems appropriate.

## COUNT II
### MAGNUSSON MOSS WARRANTY ACT ("MMWA"), 15 U.S.C. §§ 2301 et seq.

64. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

65. Defendants, collectively, are a "supplier" and/or "warrantor" within the meaning of the MMWA.

66. Plaintiff is a "consumer," as that term is defined in the MMWA.

67. The vehicle sold to Plaintiff is a "consumer product" within the meaning of the MMWA.

68. There is no dispute resolution mechanism which applies to Plaintiff's warranty dispute.

69. In the alternative, Defendants have no dispute resolution mechanism which is enforceable under the MMWA and, also in the alternative, Plaintiff's repeated good-faith attempts to resolve any dispute with Defendants, which were rebuffed, constitute compliance with any reasonable dispute resolution requirement.

70. Defendants violated the MMWA and its implementing regulations by failing to clearly and conspicuously make disclosures required under the MMCWA and its implementing regulations.

9

71. Defendants violated the MMWA and its implementing regulations (e.g. 16 C.F.R. 701.3) by failing to disclose, inter alia, the terms, coverage, and procedures of a warranty in clear statements in a single document. For example, and without limitation:

> i. At the time of the transaction, Defendants did not provide any disclosures regarding the cost of the warranty,
>
> ii. At the time of the transaction Defendants did not provide disclosures regarding any of the terms of the warranty.

72. Other than in the information provided to Plaintiff by NMAC, showing that a warranty was paid for and financed as a part of the deal, Plaintiff has no information whatsoever about the warranty and has received nothing about the warranty in writing.

73. Plaintiff has no way of knowing whether a warranty policy was actually taken out or if instead she was billed for a warranty that does not exist.

74. As a result of these violations, Plaintiff is entitled to cancel and rescind the retail installment contract and all warranties or in the alternative, to revoke acceptance, and are entitled to actual damages and declaratory judgment that Defendants' practices violate the MMWA, and reasonable attorney's fees, costs and expenses, pursuant to the MMWA.

### COUNT III
### FRAUD

75. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs.

76. Defendants intentionally and fraudulently concealed from Plaintiff that Defendants were selling her a car rather than selling a car to her sister.

77. As part of this fraudulent scheme, Defendants structured the vehicle purchase and loan transaction to obligate Plaintiff to a retail installment contract requiring Plaintiff to pay more than 10,000 more than was represented in the transaction.

78. As part of this fraudulent scheme, Defendants intentionally and fraudulently represented that Plaintiff's monthly payments would fall by $199 per month after the first four months, meaning that over the course of the loan, Plaintiff would be forced to pay back $14,129 more than she reasonably believed she would be required to pay.

79. As part of this fraudulent scheme, Plaintiff was required to purchase a warranty and a maintenance contract in order to qualify for financing to purchase the Vehicle.

80. As part of this fraudulent scheme, Defendants intentionally and fraudulently forged Plaintiff's name on documents which Plaintiff never saw or signed.

81. As part of this fraudulent scheme, Defendants intentionally and fraudulently induced Plaintiff to purchase a warranty about which she received no paperwork, which was unnecessary for the purchase of a new car, and which she was wholly unaware of until after the fact.

82. Plaintiff justifiably relied upon each of Defendants' misrepresentations of material facts, as a result of which she sustained losses and damages.

83. Had Plaintiff not been misled by Defendants, she never would have agreed to the vehicle purchase transaction.

84. As a result of Plaintiff's reasonable reliance upon Defendants misrepresentations, Plaintiff has been damaged by having traded in a car for which she was obligated to pay $361 per month and instead found herself obligated to pay $499 per month, a difference of $10,350 over the life of the loan, and as a result, Plaintiff is entitled to actual and punitive damages, attorneys fees, and costs and expenses.

## COUNT IV
## NYGBL § 350 (Unlawful False Advertising)

85. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

11

86. The acts and practices set forth above, including but not limited to misrepresenting the sale price of the vehicle by assuring Rodriguez that the sticker price was the actual price of the car, also constitute violations of NYGBL § 350, which makes false advertising unlawful, independent of whether these acts and practices constitute violations of any other law

87. This false advertising was committed in the conduct of business, trade, commerce or the furnishing of a service in this state.

88. Under NYGLB § 350, "false advertising" means "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

89. The Vehicle showed a Manufacturer's Suggested Retail Price of $25,625.00. This sticker price is "advertising," as defined by NYGBL § 350.

90. Specifically, Defendants falsely advertised the vehicle's price because they hid the true cost to the consumer of purchasing the car. Defendants did so by increasing the sales price of the vehicle from the amount advertised, both by upping the price in the contract and by adding a warranty.

91. Defendants' placing a sticker price on the Vehicle showing a price of $25,625.00, followed by listing the sale price on the RIC as $31,223.12 then followed by adding on another $384.00 in warranties over and above the stated price in order to obtain financing, taken together, represent the Defendant's false advertising.

92. Defendants' false advertising was done knowingly and willfully and committed in bad faith.

93. As a result of these violations of NYGBL §350, Plaintiff suffered actual damages including but not limited to the cost of the warranties and service contracts that were not included in the advertised price but which she was forced to purchase.

94. For these reasons, Plaintiff is entitled to injunctive relief (enjoining the false advertising practices described above), actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350.


[remainder of page intentionally left blank]

WHEREFORE, Plaintiff respectfully demands judgment against Defendants as follows:

a. On COUNT I, TRUTH IN LENDING ACT, judgment against Defendants for statutory damages, actual damages, attorney's fees, litigation expenses and costs, declaratory judgment that they have violated TILA and Regulation Z, and such other or further relief as the Court deems appropriate;

b. On COUNT II, MAGNUSON MOSS WARRANTY ACT ("MMWA"), judgment against Defendants, cancellation and rescission (or in the alternative revocation of acceptance of) the contract for the vehicle and the contract for the warranty, and actual and punitive damages, and reasonable attorneys fees, costs and expenses, declaratory judgment that Defendants have violated the MMWA, as well as such other or further relief as the Court deems appropriate;

c. On COUNT III, FRAUD, judgment against Defendants, actual damages, punitive damages, costs and reasonable attorneys fees;

d. On COUNT IV, NYGBL § 350, judgment against Defendants, injunctive relief, actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350(e), declaratory judgment that Defendants' have engaged in false advertising and such other or further relief as the Court deems appropriate;

e. Such other and further relief as law or equity may provide.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Date: July 2, 2013
New York, New York

Respectfully Submitted,

*Elizabeth Shollenberger*
Elizabeth A. Shollenberger, Esq.
Schlanger & Schlanger, LLP
*Attorneys for Plaintiff*
343 Manville Road
Pleasantville, New York 10570
Ph: 914-946-1981, ext. 103
Fx: 914-946-2930